**UNITED STATES v. FIGUR et al.**

**UNITED STATES v. PIONEER PAPER STOCK CO., Inc.**

Civ. Nos. 1697, 1698.

United States District Court
D. Minnesota, Fourth Division.

April 5, 1948.

Victor E. Anderson, U. S. Atty. and William P. Murphy, Asst. U. S. Atty., both of St. Paul, Minn., for plaintiff.

H. Z. Mendow, of Minneapolis, Minn., appeared for defendants.

NORDBYE, District Judge.

The actions as originally commenced against these defendants were instituted to restrain the defendants from violating certain regulations of the Emergency Price Control Act of 1942, as amended, 50 U.S. C.A.Appendix, § 901 et seq., and to re-

cover on behalf of the United States treble damages on account of said violations. The violations were predicated on the alleged unlawful brokerage charges collected by each of the defendants in the sale of certain secondhand paperboard shipping containers. The bases of plaintiff's actions were that a close family relationship existed between the broker and the dealer and that, under the regulations, the brokerage charge was not bona fide, and hence constituted evasion. Later, the so-called upgrading charges were added as an additional claim as against Pioneer.

The Pioneer Paper Stock Company has been in business in this City for many years and primarily is engaged in doing business in waste materials. Generally, it salvages for re-use materials that are used by paper mills in the production of new paper. It was organized in 1894 and was incorporated in 1927. The General Container Company is a partnership and was organized in September, 1943, by one Morris Figur, together with Perry Weitknecht and J. P. Hamilton. Later, they took in as partners Mrs. Irene Noodelman, Mrs. Lillian Noodelman, Mrs. Celia Slacter and Paul Ocken, and subsequently Jay Sinaiko and Arnold Epstein were admitted into the partnership. It is significant to note that this partnership was organized to carry on a general business in used cartons and containers before any O.P.A. regulations were promulgated with reference to this industry. It is fair to assume that these persons recognized the growing market in used containers and assumed that a venture into this business would prove profitable. The general regulations governing this industry under the Office of Price Administration did not come into existence until May 1, 1944.

When General launched into this business, it started out on a small scale and it may well be that it was guided and assisted to some extent by the officers of Pioneer Paper Stock Company, who had had some experience in this field. It is significant, however, that General did no business with Pioneer until some 16 months after General was in operation. Each company had its own plant, its own office, kept separate books and made separate tax

returns, and there is absolutely no evidence or even suggestion that there was any sharing of the profits or that the corporation in any way benefited from the earnings from the partnership, or that the partnership in any way benefited or participated in any earnings of the corporation. Moreover, there is an utter absence of any evidence that either concern exercised any control over the other. That there was a close family relationship between some of the partners in General and some of the officers of Pioneer must be conceded. Mrs. Irene Noodelman was the wife of Robert Noodelman, who was President of Pioneer, and Mrs. Lillian Noodleman was the wife of Oscar Noodelman, Vice President of Pioneer. Mrs Celia Slacter was the wife of Samuel Slacter, who was the secretary of Pioneer, and apparently she was also a sister of Robert and Oscar Noodelman. But, regardless of the relationship, the evidence indicates that each of these partners contributed his or her own money, and the record will not justify a finding that Pioneer in any way dominated General or that General dominated Pioneer by reason of the close family relationship which existed.

The used containers which were the basis of the business of General were usually purchased from governmental agencies so-called, that is, ordnance plants engaged in the manufacture of various war materials. Apparently, Pioneer did not become involved in the used container business to any extent, from this source, at least, until after General had ventured into this field. Later on, in 1944 and 1945, each one of these concerns did a rather extensive business in the purchase and sale of used paperboard containers. Out of a large number of used container transactions in which General did business with outside concerns and with Pioneer, plaintiff has selected some 45 transactions handled by General in which Pioneer acted as a broker. And out of a large number of used container transactions handled by Pioneer, it has selected some 40 transactions in which General acted as a broker and Pioneer as the dealer. It is these transactions which are challenged as being in violation of the regulations because the plaintiff contends that the brokerage charges cannot be sustained under the regulations. Under Revised Maximum Price Regulation 529, which became effective September 30, 1944, a broker is defined as follows:

"A 'broker' is any person who complies with the requirements of this paragraph (d) and who purchases and resells reusable or reconditioned second hand paperboard shipping containers or second hand corrugated or solid fibre inner packing material or who arranges for the sale thereof."

Paragraph (d) provides: "Under the circumstances stated in this paragraph (d), an allowance not in excess of 8% of the broker's selling price may be paid to a broker for selling or negotiating for the sale of second hand paperboard shipping containers or second hand corrugated or solid fibre inner packing materials. The maximum price at which a broker may sell second hand paperboard shipping containers or second hand corrugated or solid fibre inner packing materials shall not exceed the sum of the price paid by him under this regulation for such second hand paperboard shipping containers or second hand corrugated or solid fibre inner packing materials plus the amount of the brokerage allowance provided for herein. With respect to second hand paperboard shipping containers only, the broker may include in the computation of the price any amount actually paid by him to another for repairing, reconditioning and/or sorting such containers. If a charge for such services is included, the broker's selling price for second hand paperboard shipping containers may, in no event, exceed the applicable maximum price established under Appendices A and B, plus the amount of the brokerage allowance computed in the manner stated above. In addition, the following requirements must be satisfied:

"(1) The sale must comply with all the requirements of the regulation.

"(2) Second hand paperboard shipping containers and second hand corrugated or solid fibre inner packing material must not have been repaired or sorted by the broker or by any person with whom the broker has any connection consisting of a community of ownership or other beneficial

interest, profit-sharing arrangement, agreement for division of losses, or control based on close family relationship.

"(3) The brokerage allowance must not be split or divided with any other person.

"(4) The brokerage allowance must be shown on a separate invoice or as a separate item on the invoice accompanying the delivery. In connection with each delivery the broker must send to the purchaser a statement that the broker does not engage in the business of repairing or sorting second hand paperboard shipping containers or second hand corrugated or solid fiber inner packing material."

It will be observed that the broker, in addition to his eight per cent brokerage charge, could include in the computation of the price any amounts actually paid by him to another for the repairing, sorting, and/or reconditioning of such containers. However, such repairing or sorting could not be performed by the broker or by any person with whom the broker had any connection, consisting of a community of interest, profit-sharing, or control based on close family relationship. The particluar reasons which may have motivated the conclusion of this particular provision is not clear from the evidence. It does not follow, however, that, under some circumstances, a broker could not engage in doing sorting and repairing of used containers, but, in the event he acted as a broker, he could not engage in the sorting and repairing of the material which he handled as a broker and make the charge in addition to his brokerage fees for the services performed in such repairing and sorting. Nor could such repairing or sorting be done by any person with whom he might have the connection set forth in Subsection 2 of Paragraph (d).

However, it does not seem that Subsection 2 of Paragraph (d) regarding the repairing or sorting of second hand paperboard shipping containers is in any way involved in this proceeding because neither Pioneer nor General sorted, repaired, or reconditioned any of the cartons involved herein which were sold by them as brokers. The evidence does not reflect the circumstances with respect to any repairing or sorting which may have been done, but it would appear that the emptiers, usually the ordnance companies, took it upon themselves to do any work in this connection which might be necessary in order to repair these used containers for shipment and re-use. And, whatever work they may have done, it also seems clear that the emptiers were limited to a selling price of $60 a ton. In any event, it seems that the custom was that the emptier would sort and do whatever reconditioning might be necessary, and load these used containers in the railway car that was directed to the ultimate consumer in pursuance of instructions from either the dealer or the broker. So, therefore, when we consider the family relationship and other connections set forth in Subsection 2 of Paragraph (d), it would seem that that paragraph is not pertinent to the issues in this proceeding because it does not appear that, in the broker's selling price, there is any charge made for sorting or repairing, and if it is involved in the $60 a ton paid to the emptier, then surely there is no claim that there was any family relationship or other alliance condemned by this paragraph as between either General or Pioneer and these various emptiers, who were, as heretofore stated, in the main ordnance companies employed by the Government in the manufacture of war materials. Then, again, it should be pointed out that there is no claim that there was any division of brokerage fees. Moreover, there is no showing that, as between General and Pioneer, there was any community of ownership, profit-sharing arrangement, agreement for division of losses, or any control based on close family relationship. True, there was a close family relationship as such between the officers of Pioneer and some of the partners of General, and it may be assumed that these family ties may have occasioned a throwing of business, so to speak, from Pioneer as a dealer to General as a broker, and from General as a dealer to Pioneer as a broker. The transactions which the plaintiff condemns as violating Revised Maximum Price Regulation 529 all pertain to purchases made on one hand by General from the emptier at $60 a ton, billed to Pioneer as a broker at $100 a ton, then sold by Pio-

neer as a broker to the ultimate consumer at $100 a ton plus eight per cent brokerage. And, on the other hand, purchases made by Pioneer from the emptier for $60 a ton, sold to General as a broker for $100 a ton and then in turn sold by General as a broker to the ultimate consumer for $100 a ton plus eight per cent brokerage. The maximum price, however, that was charged in these transactions was within the limit set by the Revised Maximum Price Regulation referred to, and the ultimate user or consumer who purchased the used containers did not pay any price above the maximum price if the brokerage fees were bona fide. It is recognized under the regulations that then existed that if General bought a carload of used containers from the Quaker Oats Ordnance, for instance, at Grand Island, Nebraska, for $60 a ton and sold this car to some outside broker for $100 a ton, who in turn sold the car, for instance, to B. T. Babbitt, Inc., for $100 a ton plus eight per cent brokerage, there would be no criticism of that transaction even though the car was loaded and shipped by the Quaker Oats Company direct to the Babbitt Company without the car being loaded by either the dealer or the broker. That is, a brokerage charge under such circumstances was fully justified by a reasonable interpretation of the regulations which were in effect up to August 18, 1945, when an amendment was promulgated which modified the regulations in this regard. The transactions after August 18, 1945, will be considered later in this memorandum.

■ Witnesses for the defendants have testified that the handling of the cars by General as a broker for Pioneer, and by Pioneer as a broker for General, were bona fide transactions entered into in the general course of business without any attempt to favor either as a broker, and that in many instances General and Pioneer were competitors and actively engaged as such in attempting to procure containers from the various ordnance companies. It is entirely possible that some of the transactions involved herein were arranged between the two companies so as to enable one of the concerns to obtain a brokerage fee when the dealer could have consummated the transaction without the intervention of the broker. It may be argued that such inferences may be deduced from all of the circumstances, though there is no proof to that effect which would justify a finding of fact in accordance with the suggested inferences. However, there was nothing in the regulations up to August 18, 1945, which prevented such an arrangement. If a dealer who first bought from an emptier was willing to sell the car to some broker rather than to one of its customers, and let the broker handle the transaction and thus enjoy a brokerage fee, it cannot be said that, under the then regulations, such an arrangement would have constituted an evasion which would have required the broker to disgorge the brokerage fee. The ultimate consumer in these transactions has not complained so far as the evidence indicates and apparently was satisfied to pay the brokerage charge and recognized Pioneer or General, as the case might be, as a bona fide broker in the transaction. There is nothing in the regulations or the definition of a "broker" therein which could justify a finding that the relationship which existed between Pioneer and General forbade or disqualified either from acting as a broker in transactions in which the other might be a dealer.

Reference is made to Section 7 of Revised Maximum Price Regulation 529 which covers evasion, but that section is primarily directed to agreements and practices whereby the ultimate consumer would have to pay a price higher than that permitted by the regulation. Certainly, the general language in this section does not, in and of itself, stamp the brokerage transactions herein as evasions and therefore illegal. It does not appear that the brokerage services included mere bookkeeping transactions. Each of these concerns had its own customers. And when acting as a broker, the services as such included the ordinary services performed by a broker. The broker took upon itself the risks which are usually attendant in a business deal of this kind. The responsibility of delivery, the collection of the purchase price, and the possibility of

claims by reason of implied warranties, etc., were all burdens which the broker initially assumed. Evasion should not be spelled out of circumstances which the law permits.

This brings me to the question as to the regularity of the brokerage charges in transactions after August 18, 1945. The record indicates that there were three transactions after that date in which Pioneer acted as the broker and in which General was the dealer purchasing from the emptier, and two transactions in which Pioneer was the dealer purchasing from the emptier and General the broker. These transactions involved shipments direct from the emptier to the ultimate consumer without the unloading or reloading of the shipment. The emptier sorted the containers, loaded them, and directed the shipments. Section 12, Paragraph (d) (6), of Amendment No. 1, Revised Maximum Price Regulation 529, provides:

"Any person making a sale of reusable second hand paperboard shipping containers and/or second hand corrugated or solid fibre inner packing materials which have been sorted, repaired, reconditioned, and/or loaded for direct shipment to such person's customer by an emptier, and which merchandise actually has been shipped to the customer, shall be considered a broker with respect to the sale and subject to the provisions of this paragraph (d). Where such merchandise is shipped to a seller by an emptier employing transportation not owned or controlled by the seller and is reshipped to the seller's customer without having been unloaded, the seller shall also be considered a broker with respect to the sale and subject to the provisions of this paragraph (d)."

In the Statement of Considerations involved in the issuance of the amendment appears the following:

"It has been called to the attention of this Office that dealers in some instances have realized a $2.00 per cwt. margin on sales of second hand paperboard shipping containers and second hand paperboard inner packing material which they have not actually processed. In these cases, the emptier has sorted the containers, loaded them, and directed the shipment to its destination. The dealer acts in the capacity of a broker, i. e., he arranges the sale and gives the emptier the necessary shipping directions, but does not actually process or transport the containers or inner packing material, and in most such cases, never sees the shipment. The transaction is handled as a sale from emptier to dealer at $3.00 per cwt., followed by a sale from dealer to consumer at $5.00 per cwt. Since the dealer's function in such a transaction is identical with that of broker, there seems to be no justification for a margin in excess of the 8% permitted to brokers. The provisions of Revised Maximum Price Regulation 529 with regard to brokers are, therefore, amended to define as a brokerage sale any transaction involving containers or inner packing materials which have been sorted, repaired, reconditioned, and loaded for direct shipment to the consumer by an emptier (a definition of 'emptier' is added to Section 11). This new provision also includes as a brokerage sale, cases where the merchandise is shipped to an intermediate seller who in turn ships it to the consumer without unloading or reloading the shipment. This latter provision is necessary to prevent the evasion of the regulation."

The custom of the emptier to sort, repair and recondition in so far as might be necessary and load for direct shipment apparently was not contemplated by the framers of Revised Maximum Price Regulation 529, and the margin of profit obtained by the dealers was considered out of line in view of the effort expended by them in performing the services which devolved upon them. This evidently occasioned Amendment No. 1.

 I would conclude, under the amendment, that where Pioneer or General, as the case might be, purchased secondhand paperboard containers from the emptier, and the emptier sorted the containers and loaded them and directed the shipment to its destination without any unloading or reloading, the one who purchased from the emptier under such circumstances is considered to be the broker and is limited to an eight per cent margin as brokerage fees, presumably eight per cent on the $60 a ton paid to the emptier. Consequently, in the

transactions within the bill of particulars filed as to these defendants which took place after August 18, 1945, when Pioneer was the original purchaser with the shipment going direct to the consumer, and General acting as the broker, and the sorting and loading and shipping were handled by the emptier, the amendment to the regulations will not consider General as a broker in the event it purchases from Pioneer, but will consider Pioneer as the broker and limits its margin to eight per cent on the $60 per ton purchase price. And the same reasoning applies to the situations where General was the original purchaser and Pioneer assumed to act as the broker. Therefore, the brokerage fees collected by the second purchaser under such circumstances occurring after August 18, 1945, cannot be sustained.

 It would seem that this amendment was directed to put an end to certain practices carried on by these defendants; that is, taking two dollars a hundredweight margin of profit on sales of secondhand paper containers which were sorted, loaded and directed to the ultimate consumer by the emptier from whom the purchase was made. It is undoubtedly true that, in most of the cases involved in the bill of particulars, neither Pioneer nor General ever saw the shipments, and it may be that the former regulations permitted a margin of profit that the framers of the amendment considered unconscionable even though the final selling price was within the maximum ceiling price permitted. But, notwithstanding, this Court cannot condemn as unlawful practices which, under the former regulations, were not condemned by clear and unambiguous language as unlawful. Regulations must be sufficiently explicit and unambiguous to enable an ordinary, intelligent person to determine whether his business practices contravene the law. Interpretation should not be in the realm of conjecture or confusion. Moreover, it is not without some significance, at least, that the Acting Chief Counsel of the Paper and Paper Products Branch of the Office of Price Administration in letters to defendants' counsel during the period in question, and which letters were admitted as genuine in defendants' request for admissions pursuant to Rule 36, Federal Rules of Civil Procedure, interpreted Revised Maximum Price Regulation 529 in the same way as interpreted by the defendants herein. That is, he stated that it permitted a dealer in purchasing at $60 a ton from the emptier to sell to a broker for $100 a ton and then allow the broker an eight per cent margin for his services. It was the so-called family relationship between the parties herein which apparently suggested to the Office of Price Administration that the brokerage transactions involved were unlawful, not the margin of profit as between the purchaser's price and the seller's price, or the right of the second purchaser to act as a broker. If, however, such transactions were legal as between strangers, they must be considered as lawful under the evidence herein and under the regulations as between these defendants.

 The other question involved pertains to the alleged upgrading. Apparently the plaintiff relies on the record which reflects that General purchased certain containers from various ordnance plants on the weight basis at $60 per ton and sold the containers to Pioneer on the unit basis. And then, Pioneer, acting as a broker, would sell to the ultimate consumer on the unit price basis plus eight per cent broker's commission. Plaintiff contends the sale to the ultimate consumer should have been on the weight basis and that a sale on a unit basis constituted upgrading. Schedule A, Appendix A, Paragraph 3, Maximum Price Regulation 529, provides:

"Unless the containers are sorted by size and the number of containers of each size in the shipment is shown on the invoice, the maximum price for the containers must be determined on the weight basis in Table I * * *. When a shipment contains a mixture of containers made of paperboard testing 200 pounds or less with containers made of paperboard testing 275 pounds or more, the maximum price for the entire shipment must be the applicable maximum price for the containers of 200 pound test or less."

The record reflects that the charge of upgrading was first made against Pioneer in April, 1947, and the amendment charging upgrading was allowed as to it because

the transactions which were the bases of the claimed unlawful brokerage charges against Pioneer were the same transactions in which the charges of upgrading were based. Plaintiff, however, did not desire at that time to press its amended bill of particulars as to General. Later, it filed an amended bill of particulars against General stating that "the additional overcharges as set forth herein did not arise from the same transactions listed in the original bill of particulars heretofore filed, but occurred during the period of violation as alleged in the original complaint and involve a portion of the same transactions for which plaintiff claims overcharges in the case of Fleming v. Pioneer Paper Stock Company, Civil Action No. 1697." The motion for leave to file the amended bill of particulars in the case against General was first noted for hearing on May 8, 1947, and later the motion was continued for hearing until September 8, 1947. But, in so far as the record indicates, there never was a hearing on this motion, and there is no record that the amended bill of particulars as to General was allowed. It would seem, therefore, that the upgrading charge is leveled only at Pioneer, and in absence of an allowance of the proffered amendment as to General, it will be so considered. There are two reasons why the charge cannot be sustained. First, there is no evidence that Pioneer ever did any upgrading or had any knowledge that any upgrading was being done as to the transactions set forth in the amended bill of particulars in the proceeding in which it is a party. As to all of these transactions, General was the purchaser from the emptier and handled the transaction as a dealer and sold the secondhand containers to Pioneer, who merely acted as a broker and resold the containers to the ultimate consumer. Second, the evidence indicates that, when the emptiers loaded these cars, all of them except six were loaded with containers of a single test size, to wit, 275 pound containers, and there were only six cars in which there were loaded 200 pound test and 275 pound test containers; that as to these six cars it appears that the emptier notified General as to the number of 275 pound test containers and the 200 pound test containers, that is, these cartons

were segregated and were not mixed within the meaning of the regulations. They were billed by Pioneer to the ultimate consumer under a unit price and paid for by the ultimate consumer on this basis. So far as the record indicates, no complaint was ever made by the ultimate consumer that when it paid for a 275 pound test container, it did not receive a 275 pound test container. There is no prohibition against the buying of containers on a weight basis and selling them on a unit basis if the various containers as to poundage test are not mixed and if they are capable of being segregated. The evidence indicates that when General bought these containers on a weight basis, it was the custom of the emptier to securely bale the containers in separate bales and that each bale would contain containers of the same poundage test; that upon shipment being made the emptier would notify the dealer by telegram as to the number of 275 pound test bales and the number of 200 pound test bales that were contained in the shipment. In this way, General was able to bill Pioneer on a unit basis and Pioneer was able to bill the ultimate consumer accordingly. It is difficult to believe that, if defendant's testimony in this regard as to the custom and as to what was done in regard to these particular shipments is not true, there would be an utter absence of complaint from the ultimate consumer who undoubtedly was fully acquainted with the regulations and fully understood that he was not supposed to pay for 275 pound test used containers unless he received containers with such poundage test. In view of the testimony, and plaintiff's failure to prove otherwise, it must be concluded, therefore, that there was not a mixture of containers within the meaning of the regulations, and that the grading of the cartons by Pioneer with reference to the six cars in question was in accord with the regulations.

At the time this case was submitted, there was presented a motion to substitute the United States as a party plaintiff. Objection was made by the defendants on the ground that the action had abated because the Price Administrator's successor had not been appointed in conformity with Rule 25(d) of the Federal Rules of Civil

Procedure, 28 U.S.C.A. The motion was taken under advisement. The case of Fleming v. Ben E. Goodwin Company, 8 Cir., 165 F.2d 334, sets at rest any question as to the right of the United States to be substituted as party plaintiff under the circumstances. The motion is therefore granted.

Findings of fact and conclusions of law in harmony herewith may be presented on five days' notice.

An exception is allowed.